IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION


UNITED STATES OF AMERICA    )
                            )
        v.                  )    CRIMINAL ACTION NO.
                            )      3:13cr122-MHT
TYSON SCOTT KLEAR           )         (WO)

OPINION

Defendant Tyson Scott Klear possessed significant numbers of digital images and videos portraying child pornography, which he distributed without compensation over a peer-to-peer computer network.  Klear pled guilty to one count of knowingly distributing child pornography in interstate commerce, 18 U.S.C. § 2252A(a)(2).  The court continued the hearing and reserved ruling on Klear's motion for a variance and his final sentence. For the reasons discussed below, the court will grant his motion.  Klear should receive a sentence of nine years, rather than the United States Sentencing Guideline minimum of 12 years and seven months.

## I. BACKGROUND

Klear began collecting digital child pornography during or before April 2009.  In that month, his employer discovered pornographic images of underage boys on a shared computer in the workplace and called the FBI.  The images were in a specially labeled folder.  The employer also noticed that someone had accessed an email address associated with Klear around the same time as the images were downloaded to the computer.  However, when an FBI agent interviewed Klear, he denied any knowledge of child pornography, and the agent found no child pornography on Klear's home computer.

FBI investigators regularly peruse peer-to-peer file-sharing networks in order to identify individuals who possess and distribute child pornography.  On three separate instances in 2010, 2011, and 2012, FBI agents identified a user of the GigaTribe sharing network with the screenname ThirstyThurston4 as possessing and sharing child pornography.  On each occasion, the agent was able

to download child pornography from ThirstyThurston4's computer. During the third and final occasion, on September 12, 2012, an agent noticed a password-protected folder that ThirstyThurston4 was sharing on GigaTribe. The agent communicated with ThirstyThurston4 in the program's chat and requested the password. ThirstyThurston4 provided the password, allowing the agent to access the folder, which contained child pornography. FBI agents traced the user to IP addresses that were registered to Klear's next-door neighbor's wireless internet router.

When the FBI agents connected Klear's previous interview with the fact that he lived next to the ThirstyThurston4 IP address, they sought a search warrant for his residence. The search revealed two computers with approximately 1,000 images and 300-400 videos of child pornography, of which the National Center for Missing and Exploited Children identified 235 pictures

3

and 49 videos as part of child-pornography series portraying known victims.

At the sentencing hearing, the government, probation, and defense counsel agreed that Klear's collection was larger than the average collection in a child-pornography case, but not at the extreme high end of all cases. They also agreed that a significant percentage of the collection represented pre-pubescent minors, but not very young children or infants. A very small percentage represented sadomasochistic and violent treatment of minors.

Klear offered the testimony of an expert witness, Dr. Suzonne Kline. Dr. Kline is a clinical psychologist who was previously the administrator of Florida's Sexually Violent Predator Program. She testified that, in that capacity, she evaluated numerous sex offenders with various characteristics in order to determine their potential dangerousness to the community. In her evaluation of Klear, she determined that, although he

4

does experience attraction to minors, he does not pose a significant danger of engaging in a "contact offense." In other words, Klear is unlikely to molest a minor physically. Furthermore, she testified that with proper treatment, Klear would be unlikely to seek, possess, or distribute child pornography.

Finally, Dr. Kline and Klear's counsel attributed Klear's interest in child pornography to an adolescent sexual experience. When he was 13, Klear was pressured by a slightly older male peer to engage in sexual behavior over the course of a weekend. Dr. Kline testified that this experience stunted Klear's emotional and sexual development.

## II. DISCUSSION

Klear's crime of conviction carries a potential custodial sentence of 5-20 years (60-240 months). 18 U.S.C. § 2252A(b)(1). In a binding plea agreement under Fed. R. Crim. P. 11(c)(1)(C), the government agreed to

seek a sentence no higher than the very bottom of the range calculated by applying the United States Sentencing Guidelines, paired with a lifetime term of supervised relief.  As described below, the bottom of the Guideline range is 151 months, that is, 12 years and seven months. Probation concurred with the government's recommendation.

Klear sought a downward variance to 63-78 months. Klear provided three main reasons that the court should grant such a variance: his low risk of recidivism and lower risk of a "contact offense"; the failure of the Guidelines to distinguish adequately among non-production child-pornography offenders; and the inability of Klear to receive ideal mental-health treatment while incarcerated.

## A. Klear's Guidelines Calculations

The Base Offense level for Klear's conviction, 18 U.S.C. § 2252A(a)(2), is 22.  U.S.S.G. § 2G2.2(a)(2).

Klear also qualifies for five Special Offense Characteristics, leading to a total 15-level increase as follows:

- Because some of the files on his computer portrayed pre-pubescent minors, he receives a two-level increase. U.S.S.G. § 2G2.2(b)(2).

- Because he distributed the files but without monetary gain or distribution to a minor, he receives a two-level increase. U.S.S.G. § 2G2.2(b)(3)(F).

- Because some of the files on his computer showed sadistic and violent conduct, he receives a four-level increase. U.S.S.G. § 2G2.2(b)(4).

- Because he used a computer to possess and distribute the pornography, he receives a two-level increase. U.S.S.G. § 2G2.2(b)(6).

- Finally, Klear had at least 235 images and 49 videos of child pornography. Under § 2G2.2 comment n.4(B)(I) and (ii), each video counts as

at least 75 images.  Therefore, Klear had many more than 600 images as counted by the Guideline, and he receives a 5-level increase. U.S.S.G. § 2G2.2(b)(7)(D)

Before adjustments or departures, Klear's offense level is 37 (22 + 15).  However, he received a three-level downward adjustment for acceptance of responsibility.  U.S.S.G. § 3E1.1.  Therefore, his final offense level is 34.  Since Klear has minimal Criminal History, he was in Criminal History Category I, resulting in a Guideline  sentence range of 151-188 months.[1]

### B. Judicial Discretion in Sentencing

Having reviewed the Guidelines calculation, the court must now determine a reasonable sentence.  The Supreme Court introduced the current framework for a district court's sentencing decision in United States v. Booker,

_____

1. In 1999, Klear pled guilty to stealing money from a home improvement store in an amount between $ 300 and $ 5,000.  Adjudication was withheld.

8

543 U.S. 220 (2005).  The Court declared unconstitutional the provision of the Sentencing Reform Act of 1984 making the Sentencing Guidelines mandatory.  Instead, the district court must independently determine a reasonable sentence by applying the sentencing factors listed in 18 U.S.C. § 3553(a):

> "(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> "(2) the need for the sentence imposed--
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> "(3) the kinds of sentences available;
>
> "(4) the kinds of sentence and the sentencing range established for--

> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the [sentencing] guidelines ...
>
> "(5) any pertinent policy statement [by the Sentencing Commission] ...
>
> "(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> "(7) the need to provide restitution to any victims of the offense."

The Sentencing Commission attempts to apply the same factors, such that "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale." Rita v. United States, 551 U.S. 338, 348 (2007). A judge may, in the course of an individual sentencing, determine that "the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply [or] the Guidelines sentence itself fails properly to reflect § 3553(a) considerations." Id. at 351.

The leading case for the second rationale, grounded in policy disagreement with the Sentencing Guidelines, is Kimbrough v. United States, 552 U.S. 85 (2007). Kimbrough was convicted of three drug charges, involving both crack and powder cocaine, and a firearms charge. The minimum sentence for the combined charges was 15 years, and the Guideline range started at 19 years. The sentencing judge sentenced Kimbrough to 15 years, justifying his variance in part because the Guideline range "exemplified the 'disproportionate and unjust effect that crack cocaine guidelines have in sentencing.'" Id. at 93 (quoting transcript of sentencing hearing). The Supreme Court affirmed the downward variance, noting that the Sentencing Commission had published reports describing the disparity between crack- and powder-cocaine sentences as unjustified and that the trial court had also independently appraised Kimbrough's individual circumstances. However, the Supreme Court remarked that "closer [appellate] review may be in order

11

when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range fails properly to reflect § 3553(a) considerations even in a mine-run case." <u>Id</u>. at 109

### C. Sentencing Commission Report

In December 2012, the Sentencing Commission issued a Report to Congress on non-production child pornography offenses: United States Sentencing Comm'n, <u>Special Report to Congress: Federal Child Pornography Offenses</u> (Dec. 2012). The report calls into question how well the current Guideline for such offenses, Guideline 2G2.2, satisfies the § 3553(a) factors, even for the average offender. The report finds that the Guideline treats the majority of offenders substantially similarly, despite variation in the offenders' culpability and dangerousness. At the same time, many prosecutors and courts are charging and sentencing offenders to avoid the

Guidelines, creating disparities for similar offenders based on what court sentences them.

First, the Commission found that the nature of child-pornography consumption and distribution has changed since the Guideline on the issue, Guideline 2G2.2, was written, largely due to the development of the internet and peer-to-peer software. "Most of the [Guideline 2G2.2] enhancements, in their current or antecedent versions, were promulgated when offenders typically received and distributed child pornography in printed form using the United States mail." Sentencing Commission Report at 313. Now, a collector can acquire large numbers of images quickly, can have access to the very worst types of child pornography very quickly-- whether intentionally or unintentionally--and, as a result of the peer-to-peer software, is often distributing child pornography as soon as he first acquires it.

13

As a result, Special Offense Characteristic enhancements that once differentiated between more and less serious offenders now apply to nearly every non-production offender. The Commission's review of the 1,654 non-production cases in fiscal year 2010 makes these changes in behavior and Guidelines application clear:

- 73.8 % of offenders who distributed child pornography did so over a peer-to-peer network, and 30.8 % did so over email or chat/instant-message. Only 3.1 % distributed child pornography by hand or through the mail. Id. at 149.

- 96.3 % of offenders received the sentencing enhancement for use of a computer. Id. at 209

- 96.3 % of offenders received an enhancement for presence of a pre-pubescent minor. Id.

- 74.2 % received an enhancement for the presence of sado-masochistic or violent conduct. Id.

14

- 96.9 % of offenders received some enhancement for the number of images (which starts at ten or more images), id., and 69.6 % received the maximum enhancement for the number of images based on possession of 600 or more images, id. at 141.

In all, a typical offender received 13 offense levels for these common characteristics: two levels for a prepubescent minor, four for sado-masochistic images, two for use of a computer, and five for possessing 600 or more images.

Many offenders also receive the Special Offence Characteristic for distribution, U.S.S.G. § 2G2.2(b)(3)(F), due to passive distribution resulting from their use of peer-to-peer software. Depending on prosecutorial charging decisions, an offender may also receive a Base Offense level of 20 or 22, rather than 18. U.S.S.G. § 2G2.2(a)(2), (b)(1). The Commission found that 97.5 % of non-production offenders engaged in behavior that is legally defined as knowing receipt or

15

distribution and 65.4 % engaged in knowing distribution, although not all defendants are charged accordingly.  Id. at 147.

Even as many offenders receive identical, harsh treatment by the Guidelines, the report points out that more accurate indicators of culpability and dangerousness remain unaccounted for.  The Commission presents three aspects of offender behavior that would be more accurate indicators of culpability: (1) better analysis of pornography collecting behavior; (2) engagement in child-pornography communities; and (3) history of criminal sexually dangerous behavior.  The court will discuss each.

1. Content of Collection and Collecting Behavior: The Commission notes that an updated analysis of the size and content of child-pornography collections would better distinguish among offenders.  The current Guideline does take into account the size of collections, violent images, and age of children.  However, because of low

16

thresholds for applying enhancements related to the nature of child-pornography collections, the current approach does not help the court to differentiate between more and less egregious collections. The Commission also recommends that courts look to the collecting behavior, such as "the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; and the number of unique, as opposed to duplicate, images possessed by an offender." Sentencing Commission Report at 323. The Commission notes that deliberate and meticulously organized child-pornography collections are often an indicator of long-time, dedicated collectors who may be particularly voracious consumers of child pornography.

2. Engagement with Other Offenders: The Commission also discusses the changed nature of child-pornography distribution, presenting three general categories of distribution: impersonal distribution, personal

distribution, and online child pornography communities. Impersonal distribution occurs through so-called "open" peer-to-peer networks, in which any user can access any other user's files and no communication occurs among users. LimeWire is an example of an "open" peer-to-peer network. See id. at 52. Personal distribution occurs over email or through "closed" peer-to-peer programs, which are sometimes called "friend-to-friend" programs. In a "closed" peer-to-peer program, such as Gigatribe, users can chat with each other, affirmatively deciding whether to share images or seeking out particular kinds of images. See id. at 53. Finally, the Commission notes the development of online communities of child-pornography users. These communities promote discussion of sexual interest in children, offer means to share child pornography, and can often normalize sexual interest in children in offenders' minds, so that actual sexual contact with a child no longer seems as wrong. See id. at 92-99. Most disturbingly, members of child-

pornography communities often encourage each other to create new child pornography--which may lead a mere possessor to take the step to production.  <u>Id</u>. at 96.

 3. Previous Criminal Sexually Dangerous Behavior: Finally, the Commission notes that the Guidelines inadequately account for previous criminal sexually dangerous behavior.  Existing statutory and Guidelines provisions, including the Criminal History rules, fail to take into account all forms of previous sexually dangerous behavior.  <u>Id</u>. at 324.  Therefore, the Commission urges a more serious determination of offenders' prior behavior, in part because those offenders with a long history of dangerous behavior are more likely to have the antisocial personality traits that correspond with sexual contact with children.

 Due to the current Guideline's enhancements that apply to nearly every child-pornography offender, the Guideline sentences for most child-pornography offenders are close to the statutory maximums for those offenses.

As a result, there is little room for a sentencing court to take these factors into account for a more extreme offender.   Klear's case proves this point.   Having received the enhancements for content and size of his collection, use of a computer, and distribution (and after an adjustment for acceptance of responsibility), Klear's Guideline range was 151-188 months.   There are only five offense levels between that range and the statutory maximum sentence of 240 months.

Even before the Sentencing Commission's report, some courts and prosecutors recognized issues with a strict application of the Guidelines and adjusted charging and sentencing behavior accordingly.   As a result, "defendants sentenced under the non-production child pornography guidelines have received sentences outside of the applicable guidelines more frequently than defendants in all other  major types of federal criminal cases." Id. at 7.  An overwhelming majority, 95.3 %, of defendants charged with only possession of child pornography could

have been charged with receipt or distribution, which
would have led to higher sentences. Sentencing
Commission Report at 219-22. In 16.9 % of cases, plea
agreements limited the application of certain Guidelines
provisions, such as the enhancement for use of a
computer. Id. at 222-23. Furthermore, the majority of
non-production defendants receive variances or departures
leading to non-Guidelines sentences. Only 40.4 % of 2010
defendants received a within-Guidelines sentence. Id. at
224. As courts and prosecutors around the country
address the problems of the non-production Guideline in
different ways, sentencing disparities across
jurisdictions grow, defeating one of the main purposes of
the Guidelines.

All told, the Sentencing Commission report paints a
clear picture: The Sentencing Guideline for non-
production child-pornography offenses, U.S.S.G. § 2G2.2,
has come to resemble a mirror image of the crack/powder-
cocaine Guidelines at issue in Kimbrough. Where the

crack/powder-cocaine Guidelines distinguished between offenders out of proportion with the actual dangerousness of the offense, the child pornography Guideline has come to treat large majorities of offenders the same, despite important differences in the nature of those offenders' crimes, as well as their dangerousness to society.

As a result, Guideline 2G2.2 fails to satisfy several of the § 3553(a) principles. A Guideline sentence does not accurately "reflect the seriousness of the offense." § 3553(a)(2)(A). Because the outdated Special Offense Characteristics fail to distinguish between more and less serious collection behavior, the Guideline fails to "afford adequate [marginal] deterrence." § 3553(a)(2)(B)[2]. And because they fail to

_____

2. Since a Court of Appeals has considered and rejected the marginal-deterrence argument as applied in child-pornography cases, it may be useful to flesh out this point further. See United States v. Beier, 490 F.3d 572, 575 (7th Cir. 2007) (rejecting a marginal-deterrence argument by a child pornography production defendant). In the context of non-production offenses, the current Guideline allows an entry-level offender to move quickly to behavior that justifies very high Guideline sentences,

(continued...)

————————————

  2. (...continued)

such that further, more egregious behavior does not affect his sentence. For example, the Guidelines do not differentiate between offenders who have just begun to collect child pornography and those who have been collecting for a long time; the maximum enhancement for number of images is low enough that an offender downloading child pornography can reach it very quickly, especially since any video clip counts for at least 75 images, <u>See</u> U.S.S.G. § 2G2.2 cmt. n.4(B)(ii); and, once an offender possesses one sadomasochistic or violent image (which could be an image of an adult penetrating a child, <u>United States v. Hall</u>, 312 F.3d 1250, 1263 (11th Cir. 2002)), there is no additional penalty for a larger collection of such images or for even more violent and despicable images. Given the structure of the Guidelines, it would not be unreasonable for an entry-level offender to quickly determine that he was, as the saying goes, "in for a penny, in for a pound."

  The lack of marginal deterrence carries two threats. First, it may contribute to a growing demand for new child pornography, and new child pornography that is increasingly violent or uses younger and younger children, as offenders realize that there is no additional penalty for seeking such pornography. Second, and perhaps more importantly, the Commission Report describes how fluid an interest in child pornography can be. As an offender continues to seek child pornography, and especially if he participates in online communities of child-pornography collectors, his perception of normal sexuality can become increasingly distorted, and an offender can become more tempted to begin producing child pornography so that he has more and more images to trade. <u>See</u> Commission Report at 96-99. An approach to child-pornography sentencing that fails to accurately

(continued...)

account for factors which indicate potential future dangerousness and recidivism, the Guideline fails "to protect the public." § 3553(a)(2)(A).  Finally, some courts and prosecutors are responding to these deficiencies while others are not, creating unwarranted sentencing disparities.  § 3553(a)(6).

### D. Eleventh Circuit Case Law
### on Child Pornography Variances

Before proceeding to the particulars of Klear's case, the court notes that the Court of Appeals for the Eleventh Circuit has been particularly skeptical of variances for child-pornography offenders, specifically in the context of Kimbrough-style disagreements with the policies underlying the Guidelines.

In United States v. Pugh, 515 F.3d 1179 (11th Cir. 2008), a panel rejected a probation-only sentence, which

---

2. (...continued)
distinguish among offenders fails to slow an entry-level offender's descent down the slippery slope to increasingly harmful exploitation of children.

ended after five years, for possession of child pornography. The sentencing court had varied downward from a Guideline range of 97-120 months. The sentencing court had varied largely because of individualized determinations with regard to Pugh's purported lack of sexual attraction to children and correspondingly low risk of recidivism. However, the appellate court, in the course of a detailed review of the § 3553(a) sentencing factors as applied to Pugh, contrasted the child pornography Guidelines with the crack/powder Guidelines at issue in <u>Kimbrough</u>.

> "The Guidelines involved in Pugh's case, however, do not exhibit the deficiencies the Supreme Court identified in <u>Kimbrough</u>. First, the Guideline range is derived at least in part from the early Parole Guidelines, rather than directly derived from Congressional mandate. ... <u>Second, there is no indication that either the Guideline range or the policy statement involved in Pugh's sentence suffers from any criticisms like those Kimbrough identified for the crack cocaine Guidelines</u>. There, the Supreme Court found that the Sentencing Commission

> itself had 'reported that the crack/powder disparity produces disproportionately harsh sanctions.' <u>Kimbrough</u>, 128 S.Ct. at 575. <u>Here, the Sentencing Commission has not made any similar statements;</u> rather, the Guidelines and policy statement are based in part upon Congress's longstanding concern for recidivism in such cases ...."

<u>Pugh</u>, 515 F.3d at 1201 n.15 (emphasis added).

The Eleventh Circuit again announced its skepticism of such variances in its <u>en banc</u> opinion in <u>United States v. Irey</u>, 612 F.3d 1160 (2010).  Irey had pled guilty to sexual exploitation of children outside the United States for the purpose of producing child pornography, 18 U.S.C. § 2251(c).  Specifically, Irey had traveled to Cambodian brothels, where he "raped, sodomized, and sexually tortured fifty or more little girls, some as young as four years of age." <u>Irey</u>, 612 F.3d at 1166.  He filmed his cruelty and distributed it over the internet. Despite a Guideline range above the statutory maximum sentence of 30 years, the sentencing court varied

downward to sentence Irey to 17 1/2 years in prison.   In

the course of a detailed review of Irey's circumstances

and the § 3553(a) factors, the appellate courts noted

> "In <u>Pugh</u> ... [w]e concluded that the
> guidelines      sentences      for      child
> pornography    crimes,    which    reflect
> judgments   by   both   Congress   and   the
> Sentencing    Commission    as    to    the
> seriousness of the offense and the risk
> of   recidivism,   'do   not   exhibit   the
> deficiencies      the      Supreme      Court
> identified    [in    the    crack    cocaine
> guidelines] in <u>Kimbrough</u>.' <u>Pugh</u>, 515
> F.3d at 1201 n.15.  <u>We do not rule out
> the possibility that a sentencing court
> could   ever   make   a   reasoned   case   for
> disagreeing with the policy judgments
> behind the child pornography guidelines.</u>
> We   hold   simply   that   in   this   case
> (involving      production      of      child
> pornography), as in <u>Pugh</u> (involving
> possession of child pornography), the
> district   court   did   not   come   close   to
> doing so."

<u>Irey</u>, 612 F.3d at 1212 n.32 (emphasis added).

    This   court   is   convinced   that   the   Sentencing

Commission report presents exactly the basis for "a

reasoned case for disagreeing with the policy judgments

behind  the  child  pornography  guidelines." <u>Id</u>.   The

27

Commission's report makes clear that Guideline 2G2.2 fails to satisfy the 18 U.S.C. § 3553(a) factors.  It is important to note, however, that the problem with the non-production Guideline, U.S.S.G. § 2G2.2, is not that it should be more lenient in general, but rather that it fails to differentiate adequately among offenders and fails to reflect the actual culpability of behavior.  By adopting the Commission's suggested approach to such offenders, some offenders will surely be better off, but others will likely receive harsher treatment.

### E. Klear's Motion for a Variance

Now, the question becomes how to apply the Sentencing Commission's insights to the case before the court.  The Commission suggests a broad framework for sentencing. The court should consider three primary factors:

> "1) the content of an offender's child pornography collection and the nature of an offender's collecting behavior ...;

"2) the degree of an offender's engagement with other offenders -- in particular, in an Internet 'community' devoted to child pornography and child sexual exploitation; and

3) whether an offender has a history of engaging in sexually abusive, exploitative or predatory conduct in addition to his child pornography offense."

Sentencing Commission Report at 320.  Furthermore, while the presence of any one aggravating factor "warrants enhanced punishment[,] ... [t]he presence of aggravating factors from multiple categories generally would warrant a more severe penalty than the presence of aggravating factors from a single category." Id. at 321.

Unfortunately, the Commission has not yet translated these principles into specific numerical Guidelines.  In part, this is because extensive Congressional involvement in the child pornography Guidelines has calcified the existing framework.  See United States Sentencing Comm'n, The History of the Child Pornography Guidelines (Oct. 2009).  In the absence of specific guidance, the court

must use its own experience in sentencing previous child-pornography offenders to evaluate Klear's situation with regard to the factors suggested by the Sentencing Commission.

Courts have only begun to consider the Commission's report. Judge Gerrard of the District of Nebraska has provided an excellent example of how to apply the Commission's suggested approach to an individual case. United States v. Abraham, 944 F. Supp. 2d 723, 730-36 (D. Neb. 2013). This court will follow Judge Gerrard's lead and set a Base Offense level of 20 as a starting point for a typical non-production child-pornography offense. Abraham, 944 F. Supp 2d at 731. This reflects the varying Base Offense levels under the current Guidelines for possession (18), receipt (20), and distribution (22). § 2G2.2(a); (b)(1). Since the typical offender actually engages in all of these acts, it makes sense to start typical offenders at the midpoint level.

30

Under the current Guideline, an offender may receive up to 25 offense levels for conduct in which the instant offense does not involve actual or attempted contact with a minor.  U.S.S.G. § 2G2.2 (a)(2) (Base Offense level of 22 for certain convictions); (b)(2) (two-level enhancement for pre-pubescent minor; (b)(3)(A) (two to five level enhancement for distribution); (b)(4) (four-level enhancement for sadistic, masochistic, or violent content); (b)(5) (five-level enhancement for pattern or history of abuse or exploitation of a minor); (b)(6) (two-level enhancement for use of a computer); (b)(7) (two to five level enhancement for number of images).

This court will split these 25 levels across four factors:

1. Content of Klear's Collection and Nature of His Collecting Behavior: Because this factor covers a broad array of conduct, the court will assign up to nine levels, according to the following general framework: up to three levels based on the age of the children

represented in significant numbers of images, such as to indicate they were obtained intentionally; up to three levels based on whether there are a significant number of violent or sado-masochistic images of children, such as to indicate they were obtained intentionally; and up to three levels based on the depth of the offender's engagement in child pornography, as determined by examining the size of his collection, length of time the offender collected the illegal images, and whether the images were meticulously categorized. These subcategories are not mutually exclusive but rather serve as broad outlines through which the court may capture the nature and content of the offender's behavior. Thus, if the offender had an inordinate number of violent or sado-masochistic images of children, such that the number was not just significant but it was evident that such was his focus, more than three (and perhaps even up to nine) levels might be appropriate for that aspect of his collecting behavior alone.

Here, the government, probation, and Klear's own counsel agreed that Klear's collection was larger than average and contained a significant number of images of prepubescent children.  However, there were few sado-masochistic images in the collection and it was not one of the very largest that the parties had seen.  While there is evidence that Klear affirmatively sought out child pornography over the course of several years, he does not seem to have meticulously categorized it like some offenders.  The images were mixed together with legal, adult pornography.  Considering these facts together, the court finds that Klear merits a six-level enhancement for the nature of his collection.

2. Engagement with Other Offenders: Again, because this factor covers a broad array of conduct, the court will divide this factor into nine levels as follows: zero to three levels for impersonal distribution of child pornography, such as through use of "open" peer-to-peer networks (with an eye toward whether there was actual

intent to distribute over those networks); up to six
levels for personal distribution of child pornography,
such as through use of "closed" peer-to-peer networks;
and up to nine levels for participation in any online
communities devoted to child sexual exploitation.

Klear used GigaTribe to download his child
pornography. As the Commission explains, this is a so-
called "closed" peer-to-peer network, in which personal
distribution with some contact with other offenders
occurs. In Klear's case, there is proof of such contact:
the FBI agent's online chat to receive a password to one
of Klear's folders. The chat and password-protected
folder indicate that Klear took an active role in
distribution. However, there is no evidence that Klear
participated in any online communities devoted to child
sexual exploitation. Nor does he seem to have been
involved in trading images with other child-pornography
collectors, such that he might have expected to gain by
distributing his collection. In light of the use of a

34

"closed" network and the specific evidence of contact with other offenders, the court finds that Klear merits a six-level enhancement for this factor.

3. Previous Criminal Sexually Dangerous Behavior: The court would give five levels for this factor. However, since Klear has no history of such behavior and will receive no enhancement for this factor, the court will not address the nuances of how those levels may be distributed.

4. Adjustment for Multiple Factors: As noted above, the Sentencing Commission cautions that an offender who receives enhancements in more than one factor is worse than an offender who receives a similar number of enhancements primarily from one factor. However, because it is likely that most offenders will receive enhancements for the first two factors, this fourth factor could almost always be in play and thus it would not aid in distinguishing culpability among offenders. Thus, the court believes this factor, for which the court

35

would give up to two levels, should result in an
enhancement only when the offender has received the
maximum or near maximum enhancement for two or more other
factors.  Since Klear's enhancements for the nature of
his collection and for engagement with other offenders
were only in the middle range for each factor, the court
will not assign him an additional level.

Under this new calculation, Klear would receive a
offense level of 32 (20 + 12).  With a three-level
downward adjustment for acceptance of responsibility,
Guideline 3E1.1, his final offense level would be 29,
resulting in a new range of 87-108 months.

The next question is what Klear's sentence should be
within that range.  Klear lied when confronted by the FBI
about child pornography on his workplace computer, and he
downloaded child pornography using his neighbor's
internet access. The court is deeply troubled by this
conduct, for it involves innocent third parties -- his
employer and his neighbor.  These innocent third parties

were potentially exposed to suspicion or even official
charges of criminal conduct, which would have required
them to bear the expense and hassle of clearing their
names.     (The court is unsure of how often child-
pornography offenders engage in such conduct as a part of
their crimes, but it could be reasonably argued that such
conduct should, by itself, result in an additional
enhancement.) In light of Klear's involvement of innocent
third parties in his illegal behavior, the court finds
that a sentence at the top of that range, 108 months or
nine years of incarceration, is appropriate.[3]

---

3. The court's approach addresses two of the three
reasons under which Klear argued for a variance. His
third, the inability to receive the ideal form of therapy
while incarcerated, is not a compelling reason to grant
a variance because it reaches too broadly. The court
sentences individuals with much more serious addictions,
mental illnesses, and diseases to incarceration on a
regular basis. All of those defendants could potentially
receive better treatment outside of prison than they
receive while incarcerated.

F. "Truth in Sentencing"

The court believes that the approach it has followed in determining Klear's sentence promotes the important goal of "truth in sentencing."  While the phrase has been used in the context of other sentencing goals, such as definite sentencing, see 42 U.S.C. § 13704, the court now uses it to represent the idea that, while courts cannot get away from subjectivity in sentencing,  they should as much as possible use principled reasoning to arrive at an appropriate sentence.  With this goal in mind, the court concludes with three observations.

First, as noted above, the Sentencing Commission Report calls into question how well the current child pornography non-production Guideline, Guideline 2G2.2, satisfies the § 3553(a) factors, even for the average offender.  The report notes that many prosecutors and courts are charging and sentencing offenders to avoid the Guidelines.  While these prosecutors and courts are not saying that they are using the Kimbrough approach to

reach their ends, the report makes clear that <u>Kimbrough</u>-type concerns are at the heart of what is going on.  It is now time to admit that, "The emperor has no clothes."

Second, the Sentencing Commissions Report makes clear that, as a result of this lack of faith, "defendants sentenced under the non-production child pornography Guidelines have received sentences outside of the applicable Guidelines more frequently than defendants in all other  major types of federal criminal cases," Sentencing Commission Report at 7, which has in turn resulted in great disparities for similar offenders based on what court sentences them.  This court recognizes that the scheme it has developed to address this problem is far from perfect--if only because it is not based on empirical evidence.  Nevertheless, the court believes that, relying on the factors already existing and articulated by the Sentencing Commission, some effort must be made to come up with a more reasoned way to sentence those who have been convicted of child

39

pornography than a simple gut reaction that a particular sentence is appropriate.  The court therefore hopes that other courts will either refine this scheme or simply come up with a better one.  The court further hopes that, based on this dialogue among the courts and with reference to the needed empirical data, the Sentencing Commission will soon come up with a new Guideline that addresses current circumstances.

Finally and in any event, so that the record is complete, the court also notes that it could and would have granted Klear a sentence of nine years if it had not engaged in the Kimbrough analysis of the child pornography Guideline.  In other words, like other courts, this court would have pointed to Klear's prior minimal criminal record.  See United States v. Gray, 453 F.3d 1323 (11th Cir. 2006) (affirming variance from a Guideline minimum of 151 months to 72-month sentence based in part on prior minimal criminal record).  And it would have pointed to Klear's "supportive family

structure, his demonstration of remorse for the crimes he
committed, and his decision to seek out psychological sex
offender treatment." United States v. Scalise, 398 Fed.
Appx. 736, 739 (3d Cir. 2010) (affirming variance from
Guideline minimum sentence of 210 months to 168-month
sentence).   Of course, there are some circumstances in
which a variance is justified by the particular personal
circumstances of a defendant.   See, e.g. United States v.
McBride, 511 F.3d 1293 (11th Cir. 2007) (affirming
variance from Guideline minimum sentence of 151 months to
84-month sentence based on extensive history of childhood
abuse and abandonment).   Indeed, Dr. Kline, the
psychiatrist, testified that Klear's emotional and sexual
growth was stunted.

The first two factors would have warranted a downward
variance from a sentence of 12 years and seven months.
However, the court believes that those two factors would
have lowered Klear's sentence too much if his calculated
sentence were nine years; in other words, the court

believes that a sentence under nine years would not have been adequate punishment in light of all the circumstances surrounding Klear and his offense.

DONE, this the 21st day of February, 2014.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE